Argued February 16, affirmed March 7, 1956

# LANG *v.* COASTWISE LINE
294 P. 2d 341

*Lawrence Lister* argued the cause for appellant. On the briefs were Gray & Lister and Floyd A. Fredrickson, Portland.

*Nels Peterson* argued the cause for respondent. On the brief were Peterson & Pozzi, Portland.

Before TOOZE, Acting Chief Justice, and LUSK, BRAND and PERRY, Justices.

TOOZE, A.C.J.

This is an action to recover damages for personal injuries, brought by Carl Walter Lang, as plaintiff, against Coastwise Line, a corporation, as defendant. A verdict was returned in favor of plaintiff in the sum of $12,300 as general damages and the sum of $2,356.28 as special damages, and judgment was entered accordingly against defendant. Defendant appeals.

Defendant is an Oregon corporation with its principal place of business located in Portland, Multnomah county, Oregon, and is engaged in the transportation of cargo by ships. As a part of its business, defendant possessed, controlled, managed, and operated a certain ocean-going vessel known as the S. S. Charles Crocker.

At the time of the injuries hereinafter mentioned,

plaintiff was a longshoreman employed by W. J. Jones & Son, master stevedore, in the loading of cargo on the S. S. Charles Crocker. The ship was docked at the Admiral dock on the Willamette river, in the city of Portland, with its bow pointing upstream. This dock is located on the west side of the Willamette river at a point approximately three-fourths of a mile north of the Broadway bridge.

The loading operations commenced on or prior to December 22, 1951, and continued through December 23, 1951. Heavy rolls of paper and other cargo were loaded in the No. 1 hold during the evening and night of December 22 and the morning of December 23. The night shift quit work at 5 a.m. on the morning of the 23rd. When this work was finished, the longshoremen covered the No. 1 hatch opening. Work was resumed in the No. 1 hold in the evening of December 23.

On that evening, after working for a time in No. 3 hold, plaintiff and the gang of which he was a member reported about 9 p.m. at the No. 1 hold. For a better understanding of the entire situation, we quote from the direct testimony of M. J. Fisch, a fellow workman of plaintiff, as follows:

"Q Mr. Fisch, when you got on board the CHARLES CROCKER, did you work in any particular hold first?

"A Yes.

"Q Which hold did you first work in?

"A No. 3 hatch.

"Q Did you work in any other hatch before this accident happened besides No. 3?

"A No, not that night.

"Q Do you recall what kind of cargo was taken on in hatch No. 3?

"A I don't.

"Q Do you know when you went to hatch No. 1 before this accident occurred?

"A Well, I would say about nine o'clock. That is approximate.

"Q Did you know the kind of cargo that was being loaded in hatch No. 1?

"A Yes.

"Q What kind of cargo was that?

"A Seventy-two-inch paper rolls.

"Q About how much do they weigh?

"A About a ton, 2,100 pounds.

"Q Before you went down the hold did you receive any orders or directions from any person to go down there—down the hold?

"A Yes.

"Q From whom did you receive those orders?

"A The walking boss.

"Q Pardon?

"A The walking boss.

"Q What was his name?

"A Paulsen.

"Q Before you went down the hold was there any inspection made of the beams on the hatch No. 1?

"A Yes, there was.

"Q Did you inspect the beams on hatch No. 1?

"A Yes.

"Q How many beams were on, if there were any on?

"A They were all on and we uncovered two sections.

"Q What do you mean by that?

"A Well, its takes three lengths of hatch boards. They run about thirty-six inches,—oh, longer than that; I really don't know how long they are. That is about, well, fifteen feet anyway.

"Q Were you present at the time this operation was carried on so far as uncovering the third section?

"A Yes.

"Q Will you explain to the jury in language that they can understand how you do that, how you uncover?

"A First, these hatch boards, approximately the size of thirty-six to forty—I don't know exactly the length; they come in three sections—we uncover one section at a time and stack up the hatch boards along the hatch combing [sic] and then take the strong backs out, or the beam that the hatch boards lay on. That is considered uncovering. Then you take the sling and take out the strong backs. We took out two strong backs.

"Q They are steel beams, are they not?

"A Yes.

"Q Handing you defendant's Exhibit 2, does that picture represent the general structure of the strong backs that we have been referring to?

"A Yes, that is a strong back.

"Q Hold that photograph, Mr. Fisch. After the two strong backs had been removed, what was next done?

"A Then we inspected the locks on the strong back that we left in. We only uncovered half of the hatch.

"Q Which half did you uncover?

"A We uncovered the after end.

"Q That would be—you left open the end?

"A That section there (indicating).

"Q Closest to the winches?

"A Yes.

"Q By inspecting, did you inspect the one beam or strong back that was left in, or all of them?

"A Just one, because the rest of the hatch was covered.

"Q Did you personally inspect the strong back that you did inspect?

"A Yes.

"Q What was the purpose of that inspection?

"A To inspect that lock to see that the beam was locked so that it wouldn't fall out.

"Q Which end did you inspect?

"A On the port side.

"Q Will you describe to the jury the condition that it was in?

"A *The lock wouldn't lock because of rust and being bent and one thing and another.* So I said to the boys that I thought that beam should come out. Mr. Paulsen was standing there right alongside of me. I talked to him and he looked at it and he says, 'That looks all right. It will be all right. You boys go down the hold and get to work. We have got to get the cargo aboard.'

"Q Do you know the purpose of the lock that you inspected?

"A To hold that beam in.

"Q Hold it in for what purpose?

"A In case the sling hits it or something, it won't come out.

"Q Is it a frequent occurrence for the sling to hit a strong back in loading operations?

"A It does once in a while, yes.

"Q When it hits, does it frequently, without the lock, would it frequently lift the beam up and out of the slot?

"A Not all the time.

"Q Would it sometimes?

"A Sometimes.

"Q Then is the purpose of the lock to prevent exactly that kind of thing?

"A Yes.

"*     *     *     *     *

"Q Yes. Can you state whether or not the purpose of inspecting the lock on the port side of the strong back that was left in place, was for the purpose of ascertaining whether or not the lock was in place and secure, to prevent it being lifted out from the operation of the winch?

"A Yes.

"Q Did you thereafter go down the hold with the rest of the gang?

"A Yes.

"Q Will you tell the jury what happened after you were in the hold?

"A We went into the hold and cleaned up a little cargo in the forward end. Then we were loading paper rolls, large paper rolls, in the square of the hatch. We load them with a Jensen sling. It is a padded cable sling. The load—we were finishing up about that time, eleven-thirty, and we were landing single rolls in the square, which is the same part of the hatch. There was four men in the area pushing these rolls in place and the other four on the top directing the sling. So we slipped the sling up on top of the roll so it would pull off and told the winch driver to go ahead; and he went ahead and the sling wrapped around the strong back, pulled the strong back out, and dropping the hatch covers for that one section down in the hold, injuring Mr. Lang.

"Q Did you see the hatch covers fall?

"A Yes.

"*   *   *   *   *

"Q Do you know where Mr. Lang was standing?

"A He was on top of the paper rolls in the after end of the hatch—I mean the forward end of the hatch.

"*   *   *   *   *

"Q How much room was there down in that hatch at the time the beam came down?

"A Well, twenty-six feet, something like that. I don't really know the length of the hatch down in the hold.

"Q Do you know which end of the beam was pulled out?

"A Well, it happened so fast—both of them came out.

> "Q Did the beam and all of the hatch covers come down in the hold?
>
> "A Yes.
>
> "Q Was Carl Lang working in the lower hold or 'tween decks or where was he in relation to the the decks?
>
> "A He was standing clear while the gear was going up.
>
> "Q What does that mean? Was he in the lower hold or was he in the 'tween decks?
>
> "A He was in the lower hold." (Italics ours.)

The evidence disclosed that each end of the beam (or strong back) fitted into a slot or groove in the hatch coaming. The depth of these slots or grooves was estimated to be from ten to eighteen inches. On each end of the hatch beam there is a locking device, referred to in the testimony as a lug or dog. When the locking devices are in place, the beam cannot be moved. It was one of these locking devices which Fisch testified was rusty and bent and not working. It also was this beam that was pulled loose by the sling.

Plaintiff was struck on his left leg near the ankle by one of the hatch boards, causing serious, painful, and permanent injuries.

In his complaint plaintiff charged that the proximate cause of his injuries was the unseaworthiness of the vessel, and also that defendant was negligent in the following particulars:

> "1. That said ship and its appliances were in an unseaworthy condition in that the strongback in said hatch was equipped with a defective locking device on one end in that the turn over lock was sprung.
>
> "2. That said defendant was negligent in that defendant failed to warn this plaintiff of said defective condition of said strongback lock.

"3. That said defendant was negligent in failing to inspect the said strongback and locking device before having longshoremen, and particularly this plaintiff, work in said hatch.

"4. That said defendant was negligent in failing to repair said locking device prior to requiring longshoremen to work in said hatch."

Defendant in its answer affirmatively charged plaintiff with contributory negligence and also alleged:

"That prior to the time plaintiff sustained the injuries complained of in his complaint the master stevedore by whom he was employed, or its agents, servants, or employees, had inspected the rigging, gear and appliances on the S. S. 'CHARLES CROCKER' at and near the place where plaintiff was working when he was injured; that all of the gear was in proper order and seaworthy condition; that if any defect or unseaworthiness developed during the time plaintiff was working on the S.S. 'CHARLES CROCKER', said condition and unseaworthiness was directly and proximately caused by the activities of plaintiff's said employer; that during the shift which plaintiff worked immediately prior to his injury, cargo was being taken out of hatch No. 1 by the use of the power driven gear and machinery; that in so using the power driven gear and machinery, plaintiff's employer, through its employees, agents, and servants, caused a strongback in said hatch No. 1 to become dislocated and to fall into the hatch and against plaintiff; that if there were any fault or neglect or if said S. S. 'CHARLES CROCKER' was in any way unseaworthy at the time and place complained of in plaintiff's complaint, said condition was brought about by plaintiff and plaintiff's employer and not through any act or failure of act on the part of defendant."

On the trial and in its several motions for nonsuit, directed verdict, for judgment notwithstanding the ver-

dict, and for a new trial, defendant relied largely upon its affirmative defense particularly quoted above, and upon the further proposition that contributory negligence on the part of plaintiff would be a complete bar to his right of recovery. Plaintiff urged its same contentions on this appeal.

■ We have carefully reviewed the record and find that there is substantial evidence therein warranting a jury in not only finding as a fact that the vessel was unseaworthy, but also that defendant was negligent in one or more respects as charged in the complaint. The trial court removed the second specification of negligence, that is, the specification respecting lack of warning, from the jury's consideration.

■ The question of unseaworthiness of a vessel is usually one of fact for the jury to determine. *Marstaller v. Albina Dock Co. et al.*, 191 Or 145, 156, 220 P2d 269. It was for the jury to determine whether or not the locking device on the beam was rusty, bent, and, therefore, useless in holding the beam firmly in place. If it was, and by reason thereof the beam was subject to being dislodged by the sling used in loading the cargo, as it was dislodged in this case, it is obvious that the vessel was unseaworthy in the light of the applicable law.

■ A shipowner's obligation of seaworthiness, traditionally owed by shipowners to seamen, extends to stevedores who may be injured while aboard and loading the ship, although employed by an independent stevedoring contractor engaged by the owner to load the ship. The obligation is essentially a species of liability without fault and is not limited by conceptions of negligence. *Seas Shipping Co. v. Sieracki,* 328 US 85, 90 L ed 1099, 66 S Ct 872.

The liability of a shipowner to longshoremen en-

gaged in loading the vessel for injuries resulting from unseaworthiness does not depend upon negligence, but is absolute, and exercise of due diligence does not relieve the owner of his obligation to furnish adequate appliances; the duty of the shipowner is not a concomitant of control, and his liability continues, even after control of the ship has been surrendered to the stevedores. *Petterson v. Alaska S.S. Co.*, 205 F2d 478, 347 US 396, 98 L ed 798, 74 S Ct 601.

■■ A charge of unseaworthiness of the vessel and of negligence may be included in the same complaint. The plaintiff cannot be made to elect between the two. The effect of contributory negligence, insofar as damages are concerned, is governed by the maritime law, and not by the law of this state. In admiralty, contributory negligence of a plaintiff may be considered in mitigation of damages, but it does not bar his recovery as it does under the laws of Oregon. Under maritime law, the doctrine of comparative negligence is applied with respect to damages, as it is applied under our Employers Liability Act. *Pope & Talbot, Inc. v. Hawn et al.*, 346 US 406, 98 L ed 143, 74 S Ct 202.

It is unnecessary for us to discuss this matter further. The issues in this case are determined by the authorities above cited. The trial court instructed the jury upon contributory negligence and upon mitigation of damages in connection therewith. Considering the instructions of the court as a whole, we are of the opinion that the jury was fully and capably instructed upon the law applicable to the issues in the case. As in most trials, minor errors crept into this record, but we find none of them to be prejudicial or reversible. Both parties had a fair trial.

The judgment is affirmed.